IN DEFENSE OF DEER et al., Appellants,

v.

CLEVELAND METROPARKS et al., Appellees.

[Cite as *In Defense of Deer v. Cleveland Metroparks* (2000), 138 Ohio App.3d 153.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 75760.

Decided June 19, 2000.

154

*Kenneth D. Myers* and *Avery S. Friedman,* for appellants.

*Baker & Hostetler, Thomas R. Lucchesi* and *Rebecca C. Lutzko,* for appellees.

*Betty D. Montgomery,* Attorney General, *Joan C. Weiser* and *Eva M. Brault,* Assistant Attorneys General, for the State of Ohio et al.

---

ANNE L. KILBANE, Judge.

Appellants In Defense of Deer, an Ohio not-for-profit corporation, Bonnie Vlach, and Denise Olaszak (collectively "IDOD") brought a declaratory judgment action seeking to prevent the controlled killing of three hundred deer located within the Bedford and Brecksville Metroparks Reservations during the winter months of 1998–1999. It filed this action against appellees Cleveland Metroparks, the president of the board of park commissioners, John K. O'Toole, the vice presidents of the board, David W. Whitehead and Fred Rzepka (collectively "Metroparks"), the Division of Wildlife of the Department of Natural Resources, the Division of Wildlife Council, and the Wildlife Management Supervisor for

Wildlife District Three, Dan Kramer (collectively, "division"), alleging that the division had unlawfully delegated its authority to manage wildlife to the Metroparks.[1]

IDOD contends that Judge Frank D. Celebrezze erred when he granted the various appellees' motions to dismiss. We disagree and affirm.

This dispute centers upon Metroparks' September 16, 1998 second request to the division for a deer management permit for the winter of 1998–1999 pursuant to Ohio Adm. Code 1501:31–15–08.[2] Along with the request, Metroparks submitted a document titled "A Deer Management Proposal," which stated that "the ecosystem in the Bedford and Brecksville reservations is being severely impacted by an evergrowing population of white-tailed deer. In this urban/suburban environment, with the absence of predators, the deer population continues to grow and negatively impact the total environment." The proposal further noted that with the "ever-expanding brows[e]line" came "a loss of biodiversity":

"Woody seedlings are rapidly disappearing * * * and upsetting future woodland regeneration. On-going studies indicate a decline in song bird and herbaceous plant diversity. Planting within the parks without total deer protection is a lost cause. Complaints concerning 'park deer' by nearby residents are on the rise. Visitors and nearby residents are concerned with the possibility of deer/vehicle encounters."

The proposal set forth Metroparks' deer management activities to date and indicated that, after a review of options available, it had elected to employ lethal means, specifically sharpshooting, during hours the park would be closed. It estimated a density of one hundred nineteen deer per square mile in the Bedford reservation and sixty-nine deer per square mile in the Brecksville reservation and contended that three hundred antlerless deer needed to be removed from the reservations to "lessen the starvation potential in late winter * * * and allow the recovery of the forest understory and related biodiversity." The long term goal was to reduce the number of deer to twenty per square mile.

---

1. It had originally filed this action in October 1997 to prevent the culling of deer herds during the 1997–1998 winter season, C.P. No. 342896. The program did not go forward after the grant of a preliminary injunction. It voluntarily dismissed that action on August 24, 1998, one month before the agreed trial date. There was no active permit or application pending.

2. Subdivision (A) of the rule provides as follows: "The chief of the division of wildlife hereby establishes a free deer damage control permit. Persons having sustained actual and substantial nursery, orchard, farm crop or other property damage by deer shall apply for this permit, which may be issued according to individual circumstances and need and for such length of time as determined by personnel of the division of wildlife. Failure to comply with the provisions set forth in the application for a deer damage control permit shall result in the immediate revocation of the permit and the person violating the provisions will be subject to prosecution under existing laws."

On September 21, 1998, IDOD refiled its verified complaint for declaratory relief, which included a request for a preliminary and permanent injunction, and attached copies of the September 16, 1998 permit request and deer management proposal.[3] The complaint alleged IDOD's "principal organizational objective * * * is to promote tolerance, co-existence and balance between mankind and wildlife, to educate the public regarding same, to protect and preserve indigenous wildlife and their habitats, and to maintain a workable biodiversity between all living things." Both Vlach, a trustee and officer of IDOD, and Olaszak alleged they were "frequent visitors" to the Bedford and Brecksville reservations. They claimed that, by issuing a deer damage control permit without first holding a public hearing, the Division of Wildlife impermissibly delegated its wildlife management authority to the Metroparks, that the Metroparks did not apply for such a permit, and that it did not furnish to the division evidence that it had sustained actual and substantial damage to its properties. As a result, IDOD claimed that Metroparks was not entitled to a permit.

On September 23, 1998, the division moved to dismiss IDOD's verified complaint under Civ.R. 12(B)(6) on the basis that Chapters 1531 and 1533 of the Revised Code conferred broad discretion upon the Department of Natural Resources, Division of Wildlife, to manage wild animal populations and that it held title to all wild animals in trust for the benefit of the people of Ohio. Because IDOD had admitted in the complaint that the division has exclusive legal authority and discretion to authorize or implement any deer management plan, IDOD had no basis, the division argued, for asserting that it would not exercise its discretion in issuing such a permit, nor could IDOD argue that the issuance of a permit somehow constituted an unlawful delegation of its authority.

IDOD responded that the division merely "rubber stamped" the unsupported, conclusory statements made by Metroparks contained in its proposal. Moreover, IDOD asserted, there was an important distinction between "nuisance control" by the private individual who applies for such a permit and "management" or "population control." Because the delegation of "management" and "population control" is a delegation of rulemaking authority to the Metroparks, IDOD argued, a public hearing would be required under R.C. Chapter 119.

On October 14, 1998, Metroparks filed its motion to dismiss, arguing that IDOD failed to assert any claim whatsoever against its officers. It also asserted that the division is vested with discretion to approve the permit application upon a showing of actual and substantial damage and that neither statute nor adminis-

---

3. IDOD'S motion for a temporary restraining order was withdrawn pending a decision by the division on the application.

trative rule requires particular scientific evidence in order to support such approval.

On October 30, 1998, IDOD filed a motion for leave to file an amended complaint, which the judge granted. On November 4, 1998, Metroparks filed its "renewed" motion to dismiss. In response, IDOD asserted that "there clearly is at least one unresolved legal issue in the case[:] * * * whether the issuance of such a permit under the particular facts and circumstances herein amounts to an unlawful delegation of the wildlife management authority of Defendant Division."

On November 18, 1998, the Division of Wildlife issued a "Deer Damage Control Permit" authorizing "ANY BONE [sic] FIDE EMPLOYEE OF CLEVELAND METROPARKS" to kill up to three hundred deer between November 18, 1998 and March 1, 1999 on the Bedford and Brecksville reservations, subject to detailed record keeping and reporting requirements. The division approved the permit "based on our confirmation of actual and substantial property damage," citing, in part, the "obvious and devastating 'browseline'" where low-level vegetation had been "browsed to the point where an observer could look into the woods and visually identify the lack of green vegetation."[4] It noted that "[n]ot immediately reducing the number of deer per square mile [in both] * * * reservations will very likely damage the ecosystem to a point where some species of plants might never regenerate." Additional reasons cited for the issuance of the permit included eliminating herd starvation due to decreased food supply, maintaining herd health at a reasonable level, and curtailing both property damage to private property located adjacent to the parks and human injury.

On November 23, 1998, IDOD filed its amended complaint, both unsigned and unverified, which was identical to the original except that IDOD excluded from the amended complaint the allegation that Metroparks did not apply for a deer damage control permit.

On November 23, 1998, IDOD filed the second motion for a temporary restraining order, which the judge denied. On December 1, 1998, the day before the order was journalized, IDOD filed an appeal and asked this court for a temporary injunction pursuant to App.R. 7. By order and journal entry dated December 7, 1998, we denied the motion and outlined the statutory authority of

---

4. Aerial infrared imagery in January and March 1998 estimated the Bedford population at one hundred nineteen deer per square mile and the Brecksville population at sixty-nine deer per square mile. Through visual aerial observation the Division of Wildlife estimated slightly fewer deer per square mile at the Bedford reservation and slightly more at the Brecksville reservation. Citing various authoritative sources, the proposal indicated that certain "species of songbirds were significantly less abundant on [sic] areas with deer densities exceeding 30 deer per square mile" when compared to areas with fewer than thirty deer per square mile. In addition, certain shrub species and herbaceous species disappeared when deer densities exceeded twenty deer per square mile.

the Division of Wildlife, pointing out that R.C. 1531.08 specifically granted the Chief of the Division of Wildlife authority and control in all matters pertaining to the protection, preservation, and management of wild animals. *In Defense of Deer v. Cleveland Metroparks* (Dec. 7, 1998), Cuyahoga App. No. 75620, unreported, at 9 (order denying motion for temporary injunction, Vol. 450, pp. 141–154). We also noted:

"It is clear from the record that Metroparks' application for the deer damage control permit was based on actual and substantial damage to the park property and its ecosystem. * * * In deciding whether or not to issue a permit pursuant to the Division's rule [Ohio Adm. Code 1501:31–15–08], it is exercising the authority explicitly conferred at R.C. 1531.02 to allow wild animals to be 'taken, hunted, killed, or had in possession.' "

After review of the affidavits purporting to support or negate the grant of a restraining order, we concluded that IDOD did not make "a substantial showing of likelihood of success on the merits which would warrant the issuance of temporary injunctive relief in this Court" and pointed out that the grant of a restraining order might well cause irreparable harm to the reservation ecosystems:

"The deer damage control permit issued by the Division of Wildlife [pursuant to Ohio Adm. Code 1501:31–15–08] is meant to allow Cleveland Metroparks to protect its property and the ecosystem from further actual and substantial damage. The exercise of the permit procedure serves the interests of the Division in meeting its responsibilities properly to manage the deer population imposed by statute. It is not this Court's prerogative to say whether the Division must stop what the Legislature has entrusted to [its] discretion and expertise." *Id.* at 12.

We also questioned IDOD's interest in the litigation, noting that it did "not appear to have any legally protected interest in the deer culling program" and that the permit did not impose any restriction upon it. *Id.* at 11–12.[5]

On December 9, 1998, division and Metroparks filed a "joint supplementation of pending motions to dismiss," arguing that our decision provided further reasoning to support a dismissal of IDOD's action. On December 24, 1998, IDOD filed another motion for a temporary injunction in the common pleas court action. The judge granted the motion, but he set a December 28, 1998 date for a hearing on the "merits" of the order. At the conclusion of the December 28 hearing, the judge vacated the temporary restraining order and granted the respective

---

5. This appeal was dismissed *sua sponte* on February 1, 1999 for failure to file the record.

motions to dismiss. IDOD filed an appeal but did not file a copy of the transcript from that hearing as part of the record.

IDOD raises a single assignment of error:

"The trial court erred in granting appellees' motion to dismiss."

IDOD contends that the judge considered matters outside the pleadings in granting the motion to dismiss and, further, that a motion to dismiss cannot be granted if there is some factual scenario by which it can prevail. When an appellate court reviews a judgment granting a Civ.R. 12(B)(6) motion to dismiss for failure to state a claim, it must independently review the complaint to determine whether the dismissal was appropriate. *Guess v. Wilkinson* (1997), 123 Ohio App.3d 430, 433, 704 N.E.2d 328, 329–330; *Weiszner v. Krantz* (Nov. 6, 1997), Cuyahoga App. No. 72236, unreported, 1997 WL 691173 ("The standard of review on a 12[b][6] motion to dismiss is *de novo*"), citing *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981. When construing a complaint challenged by a Civ.R. 12(B)(6) motion, a judge must presume all factual allegations contained in the complaint to be true and make all reasonable inferences in·favor of the nonmoving party. *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 192, 532 N.E.2d 753, 755–756. Dismissal of a claim pursuant to Civ.R. 12(B)(6) is appropriate only where it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *O'Brien v. Univ. Community Tenants Union, Inc.* (1975), 42 Ohio St.2d 242, 71 O.O.2d 223, 327 N.E.2d 753, syllabus; *York v. Ohio State Hwy. Patrol* (1991), 60 Ohio St.3d 143, 144, 573 N.E.2d 1063, 1064–1065. The judge, however, need not presume the truth of conclusions unsupported by factual allegations. *Mitchell,* 40 Ohio St.3d at 193, 532 N.E.2d at 756. "A complaint should not be dismissed for failure to state a claim merely because the allegations do not support the legal theory on which the plaintiff relies. Instead, [a judge] must examine the complaint to determine if the allegations provide for relief on any possible theory." *Fahnbulleh v. Strahan* (1995), 73 Ohio St.3d 666, 667, 653 N.E.2d 1186, 1187.

IDOD first argues that the judge erred by considering material outside the allegations of the complaint, specifically this court's December 7, 1998 order denying the temporary restraining order. IDOD is correct in contending that a movant may not rely upon allegations or evidence outside the complaint. *E.g., Shamansky v. Massachusetts Fin. Serv. Co.* (1998), 127 Ohio App.3d 400, 404, 713 N.E.2d 47, 49–50 citing *State ex rel. Boggs v. Springfield Local School Dist. Bd. of Edn.* (1995), 72 Ohio St.3d 94, 96, 647 N.E.2d 788, 791. IDOD is incorrect, however, in concluding that our December 7, 1998 decision on the motion for

temporary injunction is either an "allegation" or "evidence." It is, rather, the "law" as it applies to IDOD's App.R. 7 motion for temporary injunction.

 Both Metroparks and the division argue that the question of whether the division improperly delegated its wildlife management authority by issuing a permit without a public hearing is subject to the "law of the case" doctrine because this court previously decided the issue in the December 7, 1998 decision. The law of the case doctrine "provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 3, 11 OBR 1, 2–3, 462 N.E.2d 410, 412:

"The doctrine is considered to be a rule of practice rather than a binding rule of substantive law and will not be applied so as to achieve unjust results. * * * However, the rule is necessary to ensure consistency of results in a case, to avoid endless litigation by settling the issues, and to preserve the structure of superior and inferior courts as designed by the Ohio Constitution.

"In pursuit of these goals, the doctrine functions to compel trial courts to follow the mandates of reviewing courts. * * * Thus, where at a rehearing following remand a trial court is confronted with substantially the same facts and issues as were involved in the prior appeal, the court is bound to adhere to the appellate court's determination of the applicable law. * * * Moreover, the trial court is without authority to extend or vary the mandate given." *Id.,* 11 Ohio St.3d at 3– 4, 11 OBR at 3, 462 N.E.2d at 413. Accord *State ex rel. Baker v. State Personnel Bd. of Review* (1999), 85 Ohio St.3d 640, 642, 710 N.E.2d 706, 708; *Painter v. Graley* (1995), 106 Ohio App.3d 770, 773, 667 N.E.2d 78, 80–81.

██ As the cases make clear, the law of the case doctrine is ordinarily applied by a trial judge after a decision has been rendered upon appeal to a reviewing court.

In the present matter, we did not decide IDOD's earlier appeal from the December 28, 1998 order. Rather, we dismissed the case for IDOD's failure to file the record. The only action taken by this court was upon IDOD's App.R. 7 motion for temporary injunction, a matter incidental to the appeal. In determining whether IDOD had a basis for seeking temporary injunctive relief, we applied the "traditional standards, *i.e.,* whether it had made a showing of (1) a substantial likelihood or probability of success on the merits; (2) irreparable injury; (3) the possibility of harm to third parties; and (4) the public interest in the relief." *In Defense of Deer,* Cuyahoga App. No. 75620, at 2. We concluded that IDOD did not satisfy any of these factors.

██ We note that the issue now before us involves substantially the same facts and issues, but the law differs. The standard required for issuing a temporary

restraining order is dissimilar from that required for dismissing a complaint: While a person seeking a temporary restraining order needs to show "a substantial likelihood or probability of success on the merits," the person seeking the dismissal of a claim must show that the factual allegations, which are presumed true, do not support a cognizable cause of action. When a court reviews a motion to dismiss for failure to state a claim upon which relief can be granted, it must review the complaint to determine whether the factual allegations support *any possible* theory. In other words, while a consideration of the "merits" of a cause of action is appropriate when deciding whether to grant a request for a temporary restraining order, it is inappropriate to consider the merits when deciding whether to grant a request to dismiss an action pursuant to Civ.R. 12(B)(6). *Rumley v. Buckingham, Doolittle & Burroughs* (1998), 129 Ohio App.3d 638, 642, 718 N.E.2d 964, 967 ("A Civ.R. 12[B][6] motion should not be used as a determination of whether plaintiff can prevail on the merits."). For the reason that these standards differ, we will not apply the "law of the case" doctrine in this instance and, as such, neither the common pleas judge nor this court is bound by our December 7, 1998 decision on IDOD's App.R. 7 motion for temporary injunction.

We are, however, persuaded by our December 7, 1998 decision. To obtain relief under the Declaratory Judgment Act, R.C. 2721.01 *et seq.,* a plaintiff must establish the following: (1) a real controversy exists between the parties; (2) the controversy is justiciable; and (3) speedy relief is necessary to preserve the rights of the parties. *Burger Brewing Co. v. Ohio Liquor Control Comm.* (1973), 34 Ohio St.2d 93, 97, 63 O.O.2d 149, 151, 296 N.E.2d 261, 264; *R.A.S. Entertainment, Inc. v. Cleveland* (1998), 130 Ohio App.3d, 125, 128, 719 N.E.2d 641, 643–644 appeal not allowed (1999), 84 Ohio St.3d 1501, 705 N.E.2d 1242. A judge may dismiss an action for declaratory judgment without addressing the merits of the case under two circumstances: "(1) there is neither a justiciable issue nor an actual controversy between the parties requiring speedy relief to preserve rights which may otherwise be lost or impaired; or (2) in accordance with R.C. 2721.07, the declaratory judgment will not terminate the uncertainty or controversy. *Wagner v. Cleveland* (1988), 62 Ohio App.3d 8, 574 N.E.2d 533, citing *Burger Brewing Co. v. Liquor Control Comm.* (1973), 34 Ohio St.2d 93, 63 O.O.2d 149, 296 N.E.2d 261." *Halley v. Ohio Co.* (1995), 107 Ohio App.3d 518, 524, 669 N.E.2d 70, 74; accord *R.A.S. Entertainment,* 130 Ohio App.3d at 129, 719 N.E.2d at 644.

As we noted in the December 7, 1998 decision, IDOD "do[es] not appear to have any legally protected interest in the deer culling program. [It does] not claim any pecuniary interest or ownership interest in the deer." *In Defense of Deer* (Dec. 7, 1998), Cuyahoga App. No. 75620, at 11. The ownership and title to

all wild animals within this state is in the state of Ohio, which holds title in trust for the benefit of *all* its citizens. R.C. 1531.02. The General Assembly granted the chief of the division "authority and control in all matters pertaining to the protection, preservation, propagation, possession, and management of the wild animals," including regulatory power. R.C. 1531.08. The General Assembly also specifically granted the division the power and authority to "[e]nforce by proper legal action or proceeding the laws of the state and division rules for the protection, preservation, propagation, and management of wild animals * * *, and adopt and carry into effect such measures as it considers necessary in the performance of its duties." R.C. 1531.04(C). In essence, IDOD has no legally cognizable interest in the wild deer nor does it have the right to pursue an action as it relates to protection, preservation, propagation, and management of the wild deer. See *Plant v. Upper Valley Med. Ctr., Inc.* (Apr. 19, 1996), Miami App. 95–CA–52, unreported, 1996 WL 185341. While "we do not doubt the appellants' sincere and humane interests in protecting deer," *In Defense of Deer* at 13, neither a controversy nor a justiciable issue exists between IDOD and either the division and Metroparks, because it has not established rights or legal interests of its own in the wild deer or in wild deer management, *Ohio Assn. of Life Underwriters, Inc. v. Duryee* (1994), 95 Ohio App.3d 532, 534–535, 642 N.E.2d 1145, 1146–1147. The judge did not err in dismissing the complaint.

The judgment is affirmed.

*Judgment affirmed.*

Timothy E. McMonagle, P.J., and Patton, J., concur.