[Cite as *Allen v. Mill Creek Metro. Park Dist.*, 2024-Ohio-5105.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

DONALD ALLEN ET AL.,

Plaintiffs-Appellants,

v.

MILL CREEK METROPOLITAN PARK DISTRICT,

Defendant-Appellee.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 MA 0050**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2023 CV 01775

**BEFORE:**
Katelyn Dickey, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Marc E. Dann* and *Atty. Jeffrey A. Crossman,* Dann Law, for Plaintiffs-Appellants and

*Atty. Gregory A. Beck and Atty. Andrea K. Ziarko,* Baker Dublikar, for Defendant-Appellee.

Dated: October 23, 2024

**DICKEY, J.**

{¶1} Appellants, Donald Allen, Heidi Behnke, Paul Chicone, and James Cliff, appeal the judgment entry of the Mahoning County Court of Common Pleas awarding summary judgment to Appellee, Mill Creek Metropolitan Park District, and denying summary judgment to Appellants, in this action for declaratory judgment and injunctive relief. Appellants contend Appellee does not have statutory authority to implement the deer management program currently being administered at Mill Creek Park. Appellants further contend the trial court prejudiced Appellants when it failed to strike an opposition brief filed in response to Appellants' objections to a magistrate's decision, in violation of Civ.R. 53. For the following reasons, the judgment entry of the trial court is affirmed.

## SUMMARY JUDGMENT STANDARD

{¶2} This appeal is from a trial court judgment resolving cross-motions for summary judgment. An appellate court conducts a de novo review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. *Beckett v. Rosza*, 2021-Ohio-4298, ¶ 21 (7th Dist.).

{¶3} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) *Dresher v. Burt*, 75 Ohio St.3d 280, 296 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. *Id.* at 293. In other words, when presented with a properly supported motion for summary judgment, the

nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor.  *Doe v. Skaggs*, 2018-Ohio-5402, ¶ 11 (7th Dist.).

{¶4}   The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case.  In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party.  *Temple*, 50 Ohio St.2d at 327.

## FACTS AND PROCEDURAL HISTORY

{¶5}   On September 7, 2023, Appellants filed a verified complaint for declaratory and injunctive relief, which contained the following allegations:  Appellee commissioned a deer-count study based on the belief that there was an overabundance of white-tailed deer in the Park District.  Although the count was flawed, Appellee relied on the count to justify its approval of a plan to significantly reduce the Park District's population of white-tailed deer.  Appellants, who are owners of property adjacent to Mill Creek Park, would be at risk should the deer management plan be implemented, because it authorizes hunting throughout the Park District during daylight hours.  Finally, Appellee is without statutory authority to administer the deer management program.

{¶6}   In addition to the verified complaint, Appellants filed a motion for a preliminary injunction prohibiting the implementation of the deer management program scheduled for October 1, 2023.  A hearing on the motion was scheduled to be conducted before the Magistrate on September 21, 2023. The matter was reset to September 28, 2023 pursuant to a motion by Appellee for additional time to prepare for the hearing.

{¶7}   The testimony at the hearing regarding the details of the various studies upon which the deer management plan was based is largely irrelevant to the purely legal issue before us. Nonetheless, the following facts provide context for Appellant's arguments.

{¶8}   Appellants offered the testimony of Dennis Malloy, a county commissioner in Trumbull County and the regional director of Whitetails Unlimited Inc., a national non-profit deer management and conservation organization.  Malloy, who has a degree in wildlife management and spent his thirty-five year career "dealing with white-tailed deer

in some capacity," testified Appellee should have commissioned a biological survey, rather than a statistical survey, as the statistical survey produced results beyond anything Malloy had previously seen. He opined there was not an overpopulation of white-tailed deer in the Park District, and even assuming overpopulation, a targeted removal was the appropriate solution, rather than both a targeted removal and a controlled hunt. Malloy opined a controlled hunt would endanger the lives of individuals residing in properties adjacent to the Park District.

**{¶9}** Appellee argued that its concern regarding ecological damage was the primary motivation for the formulation of the deer management plan. Appellee offered the testimony of Nick Derico, the natural resources manager for the Park District. Derico testified he was hired in 2018 and immediately noticed widespread ecological damage in all 14 locations in the Park District (with the most severe damage in the Hitchcock and Huntington Woods areas). Derico explained white-tailed deer had stripped the landscape from the browse line down leaving empty understories. Derico offered pictures of the deer exclosure, which revealed intact understory and vegetation.

**{¶10}** In March of 2023, employees of Appellee presented the plan to Appellee's board of commissioners proposing to reduce the population of white-tailed deer in the park system, based on an ecological impact study and an infrared aerial survey of the Park District. Derico testified the deer management plan was predicated upon ecological damage, not deer density. However, the stated purpose of the plan is "to summarize current conditions concerning white-tailed deer in the Metroparks and provide meaningful science-based recommendations to improve the overall health and vitality of the deer herd, while also mitigating the negative ecological impacts associated with long-term overbrowsing and reducing human-conflict associated with an overabundance of white-tailed deer." (White-tailed Deer Management Plan, p. 4.)

**{¶11}** Derico explained the deer management program would be effectuated in two parts. First, a targeted removal by federal marksmen from the United States Department of Agriculture conducted during nighttime hours. The targeted removal of thirty deer per year had been authorized by the Division of Wildlife, Ohio Department of Natural Resources ("DOW") through a permitting process. Second, a controlled hunting program, which involves inviting individuals licensed by the state to hunt on Appellee's

property, but requires no state permit. Appellee participated in the DOW lottery system, which randomly selects state-licensed hunters who apply to participate in controlled hunts in Ohio, although participation in the lottery was not mandated by the DOW for the controlled hunt.

{¶12} Geoffrey Westerfield, an assistant wildlife management supervisor in charge of overseeing human/wildlife interaction at the DOW in Ohio, testified at the hearing. He explained hunting is legal in Ohio with a state-issued license, and the only other limitations on hunting in Ohio are the product of property rights and local ordinances. Insofar as Appellee is authorized to control the property at issue, Westerfield opined Appellee had the authority to initiate and administer the controlled hunt in the Park District. Appellants have not alleged that the deer management program violates any local ordinance.

{¶13} In a decision filed on September 29, 2023, the Magistrate overruled the motion for preliminary injunction finding Appellants failed to demonstrate a substantial likelihood of success on the merits by clear and convincing evidence. The Magistrate predicated her conclusion on Appellants' lack of standing to challenge the deer management program, as well as uncontroverted evidence of ecological damage caused by the white-tailed deer in the Park District. Appellants filed a timely notice of appeal, then a stipulation of dismissal without prejudice on October 11, 2023. Objections to the Magistrate's Decision were filed and overruled by the trial court on November 20, 2023. The trial court adopted the Magistrate's Decision verbatim.

{¶14} The sole issue of Appellee's statutory authority to implement the deer management program was fully briefed on cross-motions for summary judgment. In a decision filed on March 27, 2024, the Magistrate reconsidered her earlier decision regarding standing, and found Appellants did have standing to assert their claims based on their ownership of property adjacent to the Park District. The Magistrate further concluded Appellee had implied authority to implement the deer management program based on R.C. 1545.09, a broadly-worded statute which empowers the board of commissioners to enact bylaws "for the protection and preservation of the parks. . . and of the property and natural life therein." With respect to Appellants' argument that the DOW has exclusive dominion over wild animals in Ohio, the Magistrate opined the

targeted removal was state-sanctioned through the permitting process, and the controlled hunt, although not authorized by the state by way of a permit, was nonetheless subject to state oversight based on the method of selecting state-licensed hunters through the DOW lottery system.

{¶15} Appellants filed objections to the Magistrate's Decision, which were overruled on May 6, 2024. The trial court adopted the Magistrate's Decision verbatim. This timely appeal of the entry awarding summary judgment to the Park District followed.

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED IN DENYING SUMMARY JUDGMENT IN FAVOR OF APPELLANTS.**

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF APPELLEE.**

{¶16} Appellants contend there is no provision in Chapter 1545, captioned "Park Districts," which provides Appellee with the express authority to kill, cull, reduce, hunt, or eradicate deer in a public park. The parties do not dispute that park districts are a creation of statute, governed by a board of commissioners ("Board") appointed by the county probate judge. R.C. 1545.05. Accordingly, the authority of the Board is limited to the jurisdiction and powers conferred upon it by the enabling statute. *State ex rel. Clarke v. Cook*, 103 Ohio St. 465, 467 (1931). A board may also have implied powers, which are limited to those that "may be reasonably necessary to make the express power effective." *State ex rel. A. Bentley & Sons Co. v. Pierce*, 96 Ohio St. 44, 47 (1917). However, a power will not be implied where the board has the means to decide the issue within the confines of its express authority. *State ex rel. Mallory v. Pub. Emp. Retirement Bd.*, 82 Ohio St.3d 235, 246-247 (1998).

{¶17} Chapter 1545 provides the Board with express authority to employ a secretary and "such other employees as are necessary in the performance of the powers conferred in [sections 1545.01 to 1545.28]." R.C. 1545.07. Additional express authority

of the Board includes the power to acquire property, employ law enforcement, and obtain group insurance for employees.

{¶18} Chapter 1545 contains no separate section articulating the Board's specific duties with respect to management and control of the park district. As a consequence, Appellee relies on R.C. 1545.09, captioned "Bylaws, rules and regulations," to establish its statutory authority to manage and control the park district.  That statute reads in relevant part:

> The board of park commissioners shall adopt such bylaws and rules as the board considers advisable *for the preservation of good order within and adjacent to parks and reservations of land, and for the protection and preservation of the parks, parkways, and other reservations of land under its jurisdiction and control and of property and natural life therein.* The board shall also adopt bylaws or rules establishing a procedure for contracting for professional, technical, consulting, and other special services.

(Emphasis added).

{¶19} Appellee's reliance on R.C. 1545.09 is not misplaced as the Ohio Supreme Court observed in *Houck v. Bd. of Park Commrs. of the Huron Cty. Park Dist.*, 2007-Ohio-5586, "[t]he very purpose of a park district is the 'preservation of good order within and adjacent to parks and reservations of land, and for the protection and preservation of the parks, parkways, and other reservations of land under its jurisdiction and control and of property and natural life therein.' " *Id.* at ¶ 25, citing R.C. 1545.09.

{¶20} Section I of the Board of Park Commissioners of the Mill Creek Metropolitan Park District Bylaws ("Bylaws"), amended on September 19, 2022, is captioned "Board of Park Commissioners." Section I(g) of the Bylaws parrots the language in R.C. 1545.09, stating bylaws are to be adopted for the preservation of good order within and adjacent to parks and reservations of land, and for the protection and preservation of the parks, parkways, and other reservations of land under its jurisdiction and control and of property and natural life therein.

{¶21} Section I(f) of the Bylaws reads, in relevant part:

Pursuant to its authority in ORC Chapter 1545, the functions of the Board shall include:

. . .

2. To present, discuss and vote on policies and programs affecting the park and to study issues and set policy for the operations of the Park. To actively participate in an overall planning process and assist implementing and monitoring the plan's goals.

**{¶22}** Section I(l) of the Bylaws reads, in its entirety, "[t]he authority to supervise Park property rests with the Board, as may be delegated to its Executive Director and Park staff. This includes all land and facilities of the Park."

**{¶23}** Section III of the Bylaws, captioned "Employees," reads in relevant part, "[t]he Board of Park Commissioners of the Mill Creek Metropolitan Park District shall retain at all times the authority to take action the Board may deem necessary or in the best interests of the Park District." Section III(A) of the Bylaws, captioned "Executive Director," reads in relevant part, "The Board of Park Commissioners may hire an Executive Director . . . who shall function as the Chief Administrator Officer of the Board and be responsible to the Board for the general operation of the Park."

**{¶24}** R.C. 1545.11, captioned "Power to acquire property," also contains language that vests the Board with authority to control the property. R.C. 1545.11 reads in relevant part:

The board of park commissioners may acquire lands . . . . Such lands may be acquired by such board, on behalf of said district . . . . In furtherance of the use and enjoyment of the lands controlled by it, the board may accept donations of money or other property, or may act as trustees of land, money, or other property, and use and administer the same as stipulated by the donor, or as provided in the trust agreement.

**{¶25}** Statutes granting regulatory authority over wild animals to the DOW must also be considered in resolving the issue before us on appeal. R.C. 1531.02, captioned

"State ownership of wild animals," reads in relevant part:

> The ownership of and the title to all wild animals in this state, not legally confined or held by private ownership legally acquired, is in the state, which holds such title in trust for the benefit of all the people. Individual possession shall be obtained only in accordance with the Revised Code or [DOW] rules. No person at any time of the year shall take in any manner or possess any number or quantity of wild animals, except wild animals that the Revised Code or [DOW] rules permit to be taken, hunted, killed, or had in possession, and only at the time and place and in the manner that the Revised Code or [DOW] rules prescribe.

**{¶26}** R.C. 1531.08, captioned "Adoption of rules; activities subject to regulation," reads in relevant part, "[t]he chief [of DOW] may regulate any of the following: (A) taking [killing] and possessing wild animals, at any time and place or any number, quantity, or length, and in any manner, and with such devices as the chief prescribes . . . ."

**{¶27}** R.C. 1531.04, captioned "Powers and duties of division of wildlife," reads, in relevant part:

> The division of wildlife, at the direction of the chief of the division, shall do all of the following: . . . (C) Enforce by proper legal action or proceeding the laws of the state and division rules for the protection, preservation, propagation, and management of wild animals and sanctuaries and refuges for the propagation of those wild animals, and adopt and carry into effect such measures as it considers necessary in the performance of its duties . . . .

**{¶28}** Finally, Ohio Administrative Code 1501:31-15-08, captioned "Deer damage control permits," reads in relevant part:

> (A) The chief of the division of wildlife hereby establishes free deer damage control permits. Persons having sustained actual and substantial nursery, orchard, farm crop or other property damage by deer shall apply

for a permit, which may be issued according to individual circumstances and need and for such length of time as determined by personnel of the division of wildlife or the chief's designee.

. . .

(J) All definitions set forth in rule 1501:31-1-02 of the Administrative Code shall apply to this rule.

Ohio Administrative Code 1501:31-1-02 reads, in relevant part, " 'Person' means . . . a political subdivision of the state . . . ." "[A] park district established under the authority of R.C. Chapter 1545, is a political subdivision of the state of Ohio. *Schenkolewski v. Cleveland Metroparks Sys.*, 67 Ohio St.2d 31, 32 (1981).

**{¶29}** Appellee cites with favor the Eighth District's opinion in *In Defense of Deer v. Cleveland Metroparks,* 138 Ohio App.3d 153 (8th Dist. 2000). In that case, an Ohio not-for-profit corporation brought a declaratory judgment action challenging the issuance of a permit by the DOW for the controlled killing of three hundred deer located in the Bedford and Brecksville Metroparks Reservations. Cleveland Metroparks asserted in its application to the DOW for a deer damage control permit that the two locations had suffered obvious and devastating damage to the browse line, as well as damage to the ecosystem to a point where some species of plants may never regenerate.

**{¶30}** The matter was heard in two separate appeals, first, on the motion for preliminary injunction in an unreported case, and second, on the motion to dismiss filed by Cleveland Metroparks. On the motion to dismiss, the Eighth District ultimately concluded the nonprofit organization did not have an interest in the deer sufficient to establish its standing to assert its claims. Despite dismissing the matter on a threshold procedural issue, the Eighth District relied on the foregoing statutes to conclude in dicta: (1) the General Assembly had endowed the DOW with exclusive control over wildlife in Ohio; (2) the exercise of the permit procedure served the interests of the DOW in meeting its statutorily-imposed responsibilities to properly manage the deer population in Ohio; and (3) "[i]t is not [the Eighth District's] prerogative to say whether the [DOW] must stop what the Legislature has entrusted to [its] discretion and expertise." *Id.* at 159.

Case No. 24 MA 0050

**{¶31}** It is important to note that the nonprofit in the Eighth District case did not challenge Cleveland Metroparks authority to initiate the permit process or administer the controlled hunt. The sole argument advanced in that case was that the DOW had improperly relegated its exclusive responsibility over wild animals in Ohio to Cleveland Metroparks.

**{¶32}** Based on the foregoing statutes, administrative code sections, case law, and the bylaws adopted by the Board, we find Appellee had implied authority to initiate and administer the deer management program in the Park District. First, Chapter 1545 grants to the Board the broad authority to manage and control the Park District. More specifically, the Board has the authority to enact bylaws and rules for the protection and preservation of the parks and of property and natural life therein. The Bylaws specifically state the Board's responsibilities include presenting, discussing, and voting on policies and programs affecting the park, and studying issues and setting policy for the operations of the park district, which is precisely the process undertaken regarding the ecological damage in the Park District and the overall health of the deer at issue in this appeal.

**{¶33}** The uncontroverted testimony at the hearing established widespread ecological damage to the park district caused by white-tailed deer. Nonetheless, Appellants assert the Board has not simply the statutory authority, but a statutory duty to preserve and protect the deer, regardless of the ecological damage, because the deer constitute "natural life therein." However, Appellants' argument regarding Appellee's duty to protect the "natural life therein" applies with equal force to the ecosystem and all other forms of natural life in the Metroparks, including insects, birds, rabbits, etc.

**{¶34}** Based on the facts in this case, the Board was required to determine the best course of action to both protect and preserve the ecosystem and the white-tailed deer population. We find the foregoing determination is within the implied statutory authority vested in the Board to manage and control the Park District. Of equal import, we find the culling of deer is not directly at odds with Appellee's duty to protect and preserve the deer population, as it improves the overall health and vitality of the deer herd by preventing overpopulation and its attendant threats to the health of the deer.

**{¶35}** Moreover, Appellee falls squarely within the defined group authorized to apply for a deer damage control permit under the Ohio Administrative Code. Appellee is

a political subdivision, which is included in the administrative code's definition of "person," that has sustained actual and substantial property damage by the deer. Further, Appellants do not dispute that the permit was issued according to individual circumstances and need and for such length of time as determined by the DOW.

{¶36} Next, we find the DOW's regulation of wild animals is not necessarily exclusive, as the DOW is granted the exclusive discretion by statute to determine and exercise the scope of its regulatory power. R.C. 1531.08, reads in relevant part, "[t]he chief [of DOW] *may* regulate any of the following: (A) taking [killing] and possessing wild animals . . . ." (Emphasis added). Consistent with its authority, the DOW has limited its regulatory power regarding the taking of deer to the issuance of deer control plan permits and hunting licenses.

{¶37} Further, Westerfield testified hunting is legal in Ohio with a state-issued license, and the only other limitations on hunting in Ohio are the product of property rights and local ordinances. Insofar as Appellee is authorized to control the property at issue, Westerfield opined Appellee had the authority to initiate and administer the controlled hunt in the Park District. As previously stated, Appellants have not alleged that the deer management program violates any local ordinance.

{¶38} In summary, the Board is granted broad authority in Chapter 1545 to manage and control the Park District. Confronted with Derico's concerns regarding mounting ecological damage to the ecosystem and deer health, the Board engaged in an investigative process, then formulated and implemented a plan to address the problem, in accordance with its bylaws.

{¶39} Appellee complied with DOW regulations regarding the application for a deer damage control permit, which was issued in compliance with Ohio law. Further, Appellee selected state-licensed hunters for the controlled hunt. In other words, to the extent that DOW has regulated the taking of deer in Ohio, there is no evidence in the record that Appellee acted without statutory authority or in derogation of Ohio law in implementing and administering the deer management program in the Park District. For the foregoing reasons, we find Appellants' first and second assignments of error have no merit, and we affirm the decision of the trial court awarding summary judgment in favor of Appellee and against Appellants.

## ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ERRED IN DENYING [APPELLANTS'] MOTION TO STRIKE [APPELLEE'S] "BRIEF IN OPPOSITION" TO OBJECTIONS.**

**{¶40}** Civil Rule 53, captioned "Magistrates," permits a party to file written objections within fourteen days of the filing of a decision. If any party timely files objections, any other party may also file objections not later than ten days after the first objections were filed. Civ.R. 53(D)(3)(b).

**{¶41}** After Appellants filed objections in this case, Appellee filed a pleading captioned "Brief in Opposition to Plaintiffs' Objections to Magistrate's Decision." Appellants filed a motion to strike the opposition brief, which was never addressed by the trial court.

**{¶42}** Appellants argue the civil rule does not authorize nor countenance opposition briefs to objections. They cite case law from other Ohio districts for the proposition that a deviation from Civil Rule 53 that results in prejudice is grounds for reversal of the judgment entry on appeal. *See e.g. State v. Hayes*, 2002 WL 242115, *2 (9th. Dist. Feb. 20, 2002) ("[A] magistrate's failure to file a decision results in reversible error since a party is prejudiced by his inability to file objections to the decision[.]") *Frase v. Frase*, 2024-Ohio-2481, ¶ 10 (9th Dist.).

**{¶43}** Appellants have failed to articulate the prejudice they suffered as a result of the filing of the opposition brief. Accordingly, we find Appellants' third assignment of error has no merit.

## CONCLUSION

**{¶44}** For the foregoing reasons, the judgment entry of the trial court awarding summary judgment to Appellee, and denying summary judgment to Appellants, is affirmed.


Robb, P.J., concurs.

Hanni, J., concurs.


Case No. 24 MA 0050

[Cite as *Allen v. Mill Creek Metro. Park Dist.*, 2024-Ohio-5105.]

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be taxed against the Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**